Filed 10/23/24  P. v. Calvillo CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RENE CALVILLO,<br><br>    Defendant and Appellant. | D081753<br><br><br>(Super. Ct. No. FVA1200768) |


APPEAL from an order of the Superior Court of San Bernardino County, Ingrid A. Uhler, Judge.  Request for judicial notice granted. Affirmed.

Pensanti & Associates and Louisa Belle Pensanti for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Vincent P. LaPietra, Deputy Attorneys General for Plaintiff and Respondent.

In 2017, defendants Rene Calvillo, Angel Delgado and Andrew Pacheco were charged with murder arising from a 2012 gang-related shooting at a neighborhood park in Fontana in which a young woman was killed. Pacheco admitted being the actual shooter; Calvillo and Delgado were prosecuted as aiders and abettors. Calvillo later pleaded guilty to second degree murder.

Three years later, following an evidentiary hearing, the superior court denied Calvillo's petition for resentencing under Penal Code section 1172.6.[1] We conclude the court properly declined to continue the hearing, and substantial evidence supports its conclusion that Calvillo acted with malice when he assisted Pacheco. Accordingly, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

In November 2021, Calvillo filed a petition to be resentenced under section 1172.6.[3] The petition asserted that he pleaded guilty three years earlier because he "believed [he] could have been convicted of 1st or 2nd degree murder at trial pursuant to the felony murder rule or the natural and probable consequences doctrine." He further claimed that he "could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code § § 188 and 189, effective January 1, 2019." Codefendant Delgado, who also pleaded guilty, filed a similar petition, and the two petitions were set for

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Here we offer only a brief overview of the procedural history for general context. We will provide additional and more detailed facts as we discuss Calvillo's two principal contentions.

[3] When filed, Calvillo's petition relied on the then-applicable statute, former section 1170.95, which was later renumbered to section 1172.6. To avoid confusion, we use the latter and now-current designation throughout this opinion.

hearing together on October 27, 2022. Following an evidentiary hearing that took place over portions of several days, the court denied both petitions.[4]

## DISCUSSION

Calvillo challenges the superior court's denial of his petition on two separate grounds. He first contends the court erred in failing to grant a continuance of the hearing, which he asserts was necessary to afford him adequate notice and time to prepare. Substantively, he argues there was insufficient evidence to support a conclusion that he acted with either express or implied malice in aiding and abetting Pacheco's killing of the victim.

**A.** ***Where his attorney expressly agreed to proceed with the hearing, Calvillo cannot argue on appeal that he lacked adequate notice and time to prepare.***

The court viewed Delgado and Calvillo as similarly situated defendants in that both were prosecuted as aiders and abettors of the direct perpetrator and actual shooter, codefendant Pacheco. Before the hearing, the prosecution stipulated that Delgado's petition stated a prima facie claim for relief, entitling him to an evidentiary hearing. Believing that the two defendants were similarly situated as to the basis for their respective petitions, the court found that Calvillo also stated a prima facie claim. As a result, it announced its intention to conduct a joint evidentiary hearing for both Delgado and Calvillo.

The court next discussed with Calvillo's counsel, attorney Pensanti, certain evidentiary rulings it had already made with regard to Delgado's petition. The court said it would not consider the police reports. It would

---

[4] Respondent's unopposed request for judicial notice of the trial court's November 17, 2022 order denying resentencing is granted. Delgado filed a separate appeal, and we affirmed the court's order denying his petition in an unpublished opinion. (See *People v. Delgado* (Mar. 18, 2024, D081750).)

consider testimony from the preliminary hearing, but only to the extent it was not hearsay admitted pursuant to section 872, subdivision (b).[5] (See generally *Whitman v. Superior Court* (1991) 54 Cal.3d 1063, 1070.) The parties would be given the opportunity to present live testimony.

Pensanti found these preliminary rulings acceptable but expressed concern that she "didn't get notice of an evidentiary hearing potential." She said she wanted "to be prepared for that on behalf of my client." The court initially indicated it preferred to start the hearing with direct examination that day but said it would give Pensanti "additional time to prepare in terms of [her] examination of the witnesses" if she needed it. Pensanti again objected, claiming she needed time to prepare *before* the prosecutor conducted her direct examination and not merely before cross-examination.

What followed was an extensive back-and-forth conversation between the court and counsel attempting to identify what discovery had not been furnished to Pensanti. Ultimately, the judge relented on timing, indicating it would provide Pensanti with a missing transcript and continue the hearing for one week to allow her adequate time to prepare. As the court and counsel began to discuss dates for the continued hearing, Pensanti conceded "it shouldn't take long" for her to get ready. The judge then engaged in the following colloquy:

> "[Judge:] You are unwilling to proceed now, and maybe take a quick break before cross-examination?
>
> "[Pensanti:] You mean to start it, to get it started?

---

[5] As part of his guilty plea to second degree murder, Calvillo stipulated that the preliminary hearing transcript and police reports provided a factual basis for his plea, but he admitted no specific facts.

| | |
|---|---|
| "[Judge:] | Uh-huh. |
| "[Pensanti:] | All right.  I think that would be fine. |
| "[Judge:] | And then you just need a few days to get prepared for cross? |
| "[Pensanti:] | Yeah." |

The court then confirmed with the other counsel that they were comfortable with proceeding on this basis.  Addressing attorney Pensanti, the judge added, "[I]f you feel you need additional time for a day or a week, we can take a break.  We can get prepared for the cross-examination."  Pensanti replied with a simple, "Thank you."

A motion for the continuance of a trial or other hearing may be based on the lack of adequate time to prepare.  (See *People v. Fulton* (1979) 92 Cal.App.3d 972, 976.)  But the grounds for the motion must be clearly stated, as must the defendant's objection to the denial of such a request.  The failure to do so results in the waiver or forfeiture of the right to challenge the denial on appeal.  (*People v. McCann* (1939) 34 Cal.App.2d 376, 378.)

Here, the court was prepared to *grant* the one week continuance requested by Calvillo's counsel when, in response to a question from the court, attorney Pensanti appeared to rethink her request.  Perhaps she previously misunderstood how the court intended to proceed or the nature and extent of the material she would need to review.  In any event, in response to the court's question whether they could "get . . . started" with direct examination and then take a break of several days before cross-examination, Pensanti replied, "All right.  *I think that would be fine*."  (Italics added.)  Moments later, the court sought to confirm whether that approach was "agreeable for everybody."  Pensanti was the first to reply, "At least get it started."  Delgado's counsel added, "Sure, yes."  By assenting to the court's

5

suggested approach—particularly in light of the court's expressed willingness to grant a continuance if requested—Pensanti effectively withdrew her objection to proceeding with the hearing. Calvillo cannot now be heard to complain on appeal that the court erred by failing to grant a continuance that Pensanti agreed was unnecessary.

**B.** ***Substantial evidence supports the trial court's finding that Calvillo acted with implied malice in assisting Pacheco's killing of the victim.***

### 1. *Calvillo's Statements*

At the preliminary hearing, an officer who interviewed Calvillo testified to various statements Calvillo made when questioned about the shooting incident. Calvillo admitted being a member of a tagging gang who called themselves "Don't Show Weakness" (DSW). Pacheco and Delgado were also members of DSW. They viewed another tagging crew, "Another Latin Crew" (ALC), as a rival.

According to Calvillo, all three gang members were at a party on the night of the shooting. Calvillo brought a semiautomatic handgun to the party, and it was passed around. Pacheco ultimately retained the weapon.

At some point, Calvillo decided he wanted to go tagging at Northgate Park. He took Pacheco and Delgado with him. Calvillo drove to the park. When they arrived, Pacheco and Delgado got out of the car and walked into the park. Calvillo then heard five to six gunshots. Pacheco and Delgado ran back to the car and got in. They told Calvillo that ALC was at the park. Pacheco said he shot at them but didn't know if he hit anyone.

Calvillo drove back to the party. After the party was over, Calvillo drove Pacheco and Delgado home. When they arrived at Pacheco's residence, Pacheco handed the gun to Delgado and told him to hold it until Calvillo

6

retrieved it. Calvillo admitted picking up the weapon several days later and disposing of it.

### 2. *Pacheco's Testimony*

Pacheco testified at the evidentiary hearing. He claimed that on the night of the shooting, he was "very drunk, very intoxicated" so he couldn't "fully remember details of that night." He recalled leaving the party with Calvillo and Delgado, and that they ended up at Northgate Park. He could not remember who brought the gun to the party, but it was in his possession when they left. During the car ride they all discussed the fact that Pacheco had the weapon.

As they approached the park, Pacheco could see figures in the shadows that he believed were members of the ALC gang. There was a conversation about the figures and Calvillo stopped the car. Pacheco got out, intent on confirming the identity of the individuals in the park. He asked them, "Where you guys from?" When a voice responded "ALC," he started shooting. He claimed he did so because he was "looking for approval." Pacheco maintained he got out of the car alone. He specifically denied that there was any conversation with Calvillo and Delgado when he returned to the car.

Pacheco was impeached with statements he made to police in a 2012 interview after a waiver of his *Miranda* rights.[6] In this interview, Pacheco said that a fourth DSW member—Hector Ronces—accompanied the group to Northgate Park and sat in back behind the driver's seat.[7] Pacheco identified Calvillo and Ronces as the "main heads" or gang leaders of DSW. They drove

---

[6] See *Miranda v. Arizona* (1966) 384 U.S. 436.

[7] In his testimony at the evidentiary hearing, Pacheco claimed there were only three gang members in the car. He repeatedly denied that Ronces was part of the group.

to the park expecting to find members of ALC. Pacheco told officers that Delgado gave him the handgun while they were in the car. Calvillo explained to him that there were ten shots. Calvillo and Ronces instructed Pacheco to use the gun to shoot any ALC members they found. They said he was "gonna get killed" if he did not follow their instructions.

As they arrived at the park, Calvillo creeped along slowly without headlights. When he stopped the car, Pacheco got out with Delgado. Calvillo stayed in the car; Pacheco was not sure where Ronces was. Pacheco and Delgado starting walking toward a group of people sitting in the park. Delgado screamed, "Where are you from?" When someone said, "ALC," Pacheco started shooting. They ran back to the car and Calvillo drove away. When they got back to the party they joked about how they "got" a rival gang member. Only later did Pacheco learn he had killed someone he characterized as "an innocent girl."

Pacheco was also impeached with an October 2022 recorded phone call he made from jail to an unidentified female. In the call, Pacheco refers to the upcoming evidentiary hearing for Calvillo and Delgado. He explained that "Rene and Angel are gonna try to get the charges dropped against them" "[b]ecause I was the shooter and they were just there in the car." The female responded, "But they're the ones that made you do it." Pacheco replied, "It's to benefit them, but they need me to try to . . . not speak on their behalf, but kind of, you know?" The female then asked, "Are you gonna?" Pacheco said, "Well, I don't know what I'm gonna do."

3. *Analysis*

Calvillo pleaded guilty to second degree murder before recent changes to California murder statutes eliminated the natural and probable consequences doctrine. (See *People v. Gentile* (2020) 10 Cal.5th 830, 849

(*Gentile*).) In filing his section 1172.6 petition in November 2021, he asserted that his guilty plea was influenced by the availability of the natural and probable consequences theory, and that he "could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code § § 188 and 189, effective January 1, 2019." In finding that Calvillo had made a prima facie claim for relief, the trial court impliedly concluded that the record of his plea did not as a matter of law foreclose the possibility that the plea was influenced by the now-defunct natural and probable consequences doctrine. (See *People v. Curiel* (2023) 15 Cal.5th 433, 470.)

It is well settled, however, that "notwithstanding [the] elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile, supra,* 10 Cal.5th at p. 850.) To be liable for murder under this theory, the aider and abettor must be found to have "aid[ed] the commission of a life-endangering act." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713.) In addition, he must have "knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Ibid.*; see also *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 499.)

Here, the evidence was plainly sufficient to support a conclusion that Calvillo aided in a shooting directed at rival gang members, and that he did

9

so with the requisite mental state of malice.[8] (See *People v. Reyes* (2023) 14 Cal.5th 981, 988 ["a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence"].) Although Pacheco's testimony at the hearing minimized Calvillo's role and what he knew at the time, Pacheco's prior inconsistent statements at the time of his arrest—which were properly considered for their truth (see, e.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1144)—were sufficient to establish that Calvillo was guilty of second degree murder on a direct aiding and abetting theory. It makes no difference if he did not intend that the young woman, or anyone for that matter, be killed.

Calvillo brought a loaded semiautomatic handgun to the party and passed it around to other gang members there. He knew that Pacheco ended up with the gun. He then drove at least two of the gang members—Pacheco and Delgado—to Northgate Park intent on finding and shooting at members of a rival gang, ALC. By itself, this would be enough to sustain a finding that Calvillo aided a life-endangering act—shooting at rival gang members— knowing that Pacheco intended to commit the act, intending to assist him, knowing that it was dangerous to human life, and consciously disregarding that risk.

But there was significantly more. Pacheco stated that Calvillo was one of the "main heads" of the gang and that he instructed Pacheco to shoot any ALC members he found. The court believed "it would certainly make sense" for Calvillo to send younger gang members (Pacheco and Delgado) to confront

---

[8] The trial court appears to have concluded that Calvillo acted with both express malice—an intent to kill—and implied malice when it found that "the intended targets were member of the ALC gang" and Calvillo was clearly "motivated to kill members of the rival gang, ALC." Because we find the evidence plainly sufficient to support a finding of implied malice, we need not discuss whether it would also justify a determination that Calvillo possessed an express intent to kill.

10

a rival gang "while he remained in the car to await their [re]turn." Calvillo warned Pacheco he would be killed if he did not carry out the shooting as planned, and the court concluded that Pacheco was "telling the truth when he said that he was told to shoot by . . . Calvillo . . . ."

Calvillo protests that the trial court "over relied" on Pacheco's statements to police given his "overt credibility issues." But in assessing whether there is substantial evidence to support a factual finding, we do not reweigh the credibility of the witnesses, a task appropriately left to the finder of fact. (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) Moreover, the recorded jail phone call provides a compelling explanation for why Pacheco's testimony at the evidentiary hearing was more favorable to Calvillo and less truthful than his 2017 statements to police.[9] As Pacheco admitted in the phone call, "I guess they [Calvillo and Delgado] put me in this situation, made it hard for me . . . ." He nonetheless believed Calvillo and Delgado "[kind of] need me" to "speak on their behalf" because it could help them without hurting him. Changing his "recollection" of events to minimize the involvement of Calvillo and Delgado would be consistent with his thinking as expressed in the phone call.

The trial court's findings are fully supported by the evidence.

---

[9]    The trial court expressly found that Pacheco's "earlier statement to law enforcement is more truthful than his in court testimony."

11

## DISPOSITION

The order is affirmed.

DATO, J.

WE CONCUR:

IRION, Acting P. J.

DO, J.